Shermia ISAACS, a minor, by Stacey
ISAACS, her mother and friend
Plaintiff,

v.

BOARD OF EDUCATION OF HOW-
ARD COUNTY, MARYLAND, et
al., Defendants.

No. CIV. A. JFM–98–1254.

United States District Court,
D. Maryland.

March 30, 1999.

Lawrence S. Greenwald, Gordon, Fein-
blatt, Rothman, Hoffberger & Hollander,
Dwight H. Sullivan, ACLU of Maryland,
Baltimore, MD, for plaintiff.

Mark C. Blom, Howard County Public
Schools, Ellicott City, MD, Leslie R. Stell-
man, Blum, Yumkas, et al., Baltimore, MD,
for defendants.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiff, Shermia Isaacs ("Shermia"), by
Stacey Isaacs, her mother and next friend,
has brought this action against defendants
Board of Education of Howard County,
Dr. Michael Hickey, James Evans, Ma-
drianne Johnson, and Roger Plunkett, al-
leging that the defendants have violated
her First Amendment free speech rights
and her Fourteenth Amendment right to
be secure in her person. The parties have

filed cross-motions for summary judgment. Defendants' motion will be granted and plaintiffs motion will be denied.

## I.

Shermia is African–American and her grandfather is from Jamaica. She currently attends the ninth grade at Wilde Lake High School, a public school in Howard County. Last year, Shermia attended the eighth grade at Harper's Choice Middle School, which is also a Howard County public school. Both Harper's Choice and Wilde Lake have school rules prohibiting students from wearing hats in class. Both schools make exceptions for religious headgear such as yarmulkes and Muslim hijab, including head-scarves.

On March 23, 1998, Shermia wore a multicolored headwrap to school. She had been wearing headwraps outside of school since 1996 or 1997. She considers headwraps to be an African cultural symbol. Her mother, aunt, and grandmother all wear headwraps. Shermia wore the headwrap to school to celebrate her African–American and Jamaican cultural heritage.

When defendant Johnson, the assistant principal at Harper's Choice, saw Shermia wearing the headwrap, she escorted Shermia to the school office and asked her to remove the headwrap because it violated the school's "no hats" policy. Following several conversations between school authorities and Stacey Isaacs, the school continued to refuse to permit Shermia to attend class wearing the headwrap. After an absence of several days from school (during which the school system provided a home tutor), Shermia returned to Harper's Choice and finished the school year without wearing the headwrap to class. She has been attending Wilde Lake since the beginning of the current school year without wearing the headwrap to class.

## II.

Shermia contends that defendants' refusal to permit her to wear the headwrap in school in order to celebrate her cultural heritage violates her constitutional right to free speech. The right to self-expression is one which we cherish. However, it is not absolute and here must yield to the legitimate interests and concerns that have led to the adoption of the school's "no hats" rule.

### A.

■ The first question presented is whether Shermia's headwrap constitutes "speech." It is well established that conduct can be protected as speech under the First Amendment if the conduct incorporates a sufficient communicative element. *See, e.g., United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Courts apply a two-pronged test to determine whether conduct is protected "symbolic speech": (1) whether "an intent to convey a particularized message was present;" and (2) whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974).

Although the record reflects that Shermia may occasionally have worn the headwrap for the ancillary purpose of covering her hair on days she was not pleased with its appearance, she and her mother have consistently stated that her primary motivation was to say symbolically "I celebrate my African–American and Jamaican heritage." Whether that message is sufficiently "particularized" to meet the first prong of the *O'Brien* test may be subject to question.[1] It is also not entirely clear that

---

1. The difficulties presented by accepting the proposition that the celebration of one's cultural heritage constitutes a "particularized message" are highlighted by the fact that commonly accepted definitions of "culture" are extremely broad. As defendants note, Maryland's Code of Regulations ("COMAR") defines "cultural groups" as "groups that identify by the factors of race, ethnicity, region, religion, gender, language, socioeco-

there is a "great likelihood" that Shermia's message was and would be "understood by those who viewed it." The only evidence that any of her classmates understood her message is a hearsay statement attributed by Shermia to one of her friends. Although the record does reflect that several teachers and administrators know that the wearing of headwraps may be said to be part of the African–American cultural heritage, at least some of them became aware of this fact after the present controversy arose. Moreover, their understanding was based on what Shermia and her mother told them, not from their observation of the headwrap itself. Nevertheless, I will assume that Shermia has met the *O'Brien* test and that her headwrap does constitute protected symbolic speech.

### B.

The next inquiry is to determine the amount of First Amendment protection that the wearing of the headwrap merits. Shermia argues that the standard articulated by the Supreme Court in *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), should apply in this case. In *Tinker*, two days before a Vietnam War protest in which students planned to wear black armbands to school, the school system passed a "no armbands" rule. *See id.* at 504, 89 S.Ct. 733. After the protest, several public high school students were suspended for violating the rule. *See id.* In its analysis of the applicable level of First Amendment protection, the Supreme Court held that the school could not suppress the students' speech absent a showing that "engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509, 89 S.Ct. 733 (quotation omitted). Shermia

contends that because no such showing has been made concerning her headwrap, her speech is protected by the First Amendment.

There are clear distinctions between *Tinker* and the present case. The speech in *Tinker* was political speech, which lies at the heart of First Amendment protection. The students wore armbands to send a specific message protesting government actions, and the Court therefore found the message to be "closely akin to pure speech." *Id.* at 505, 89 S.Ct. 733. Furthermore, the school system in *Tinker* passed its regulation specifically to ban the particular message the students intended to express.

The Supreme Court expressly distinguished the case before it from a case (like this one) involving a general dress code. "The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment.... Our problem involves direct, primary First Amendment rights akin to 'pure speech.' " *Id.* at 508–09, 89 S.Ct. 733. Moreover, the Court indicated that it was setting forth the standard that must be met in order for school officials "to justify prohibition of a particular expression of opinion." *Id.* at 509, 89 S.Ct. 733. The Court, therefore, implicitly acknowledged that it was not creating a standard to govern all non-school-sponsored symbolic speech in public schools.

Although the *O'Brien* case did not arise in a public school context, I am persuaded that it articulated the criteria that lead to the soundest analysis in the present case. In *O'Brien*, the Court considered the constitutionality of a Massachusetts statute preventing the burning of draft cards in a public demonstration. *See* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. The Court upheld the restriction, stating that "when

nomic status, age or disability." *See* COMAR § 13A.04.05.02(B)(3). Webster's Dictionary defines "culture" as "[t]he totality of socially transmitted behavior patterns, arts, beliefs, institutions, and all other products of human

work and thought typical of a population or community at a given time." Webster's II New Riverside University Dictionary (Riverside Publishing Co.1994) at 335.

'speech' and 'non-speech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 376, 88 S.Ct. 1673. *O'Brien* holds that regulation of such "speech-plus-conduct" expression is valid if (1) the regulation is within the government's constitutional power, (2) the regulation furthers an important or substantial government interest, (3) the government interest is unrelated to the suppression of free expression, and (4) the incidental restriction on First Amendment rights is no greater than necessary to further that interest. *See id.*

The school's "no hats" policy passes muster under this test. Shermia does not contest the school system's authority to enact such a rule, and it is clear that the rule furthers an important government interest: providing a safe, respectful school environment that is conducive to education and learning. Defendants have enunciated many ways in which the "no hats" rule furthers that interest: hats can (i) cause increased horseplay and conflict in the hallways, (ii) obscure the teacher's view of the student wearing the hat or view of the students sitting behind that student (and as a result can cause the teacher to miss signs of substance abuse or other health problems), (iii) obscure students' view of the blackboard, (iv) allow students to hide contraband, and (v) foster a less respectful and focused climate for learning. Anyone who has spent time in a middle or high school knows that a prohibition on hats is not, as Shermia argues, "arbitrary" or "irrational."

It is likewise abundantly clear that the school's interest in banning hats in the classroom to foster a good learning environment is unrelated to the suppression of free expression. Furthermore, the restriction on expression is no greater than necessary to further the school's interest. As defendants point out, there are alternative ways for Shermia to express her message within the schools' dress code, including wearing traditional African dress or jewelry to class.

## C.

■ Shermia places great emphasis on the fact that the school system purportedly has undermined the content-neutrality of the "no hats" rule by permitting students to wear religious headgear to class. As a threshold matter, it may be that religious headgear does not constitute symbolic speech at all, since it is worn not to express a message to others but because of a mandate derived from a doctrine of reverence for deity. If that is so, the "no hats" policy by definition does not treat different types of symbolic speech differently.

In any event, assuming that religious headgear is symbolic speech, it does not automatically run afoul of the Constitution for the defendants to protect religious speech more strictly than non-religious speech. In other contexts, courts have recognized increased constitutional protection for conduct implicating more than one constitutional right. *See Herndon v. Chapel Hill–Carrboro City Bd. of Educ.,* 89 F.3d 174, 178–79 (4th Cir.1996) (noting that, in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court recognized that where a Fourteenth Amendment liberty interest is combined with First Amendment free exercise concerns, the rights are fundamental and merit strict scrutiny, while infringements on the Fourteenth Amendment interest alone are subject only to rational basis scrutiny). If the wearing of headgear constitutes speech and also represents an exercise of religion, a student would have "hybrid" constitutional protection arising out of both the free speech and free exercise. This fact alone would provide ample basis for the school system's decision to exempt religious headgear from its "no hats" policy.

### III.

■ Shermia also claims that the defendants' refusal to let her wear her headwrap violates her right to be secure in her person. The right to wear headgear is not a "fundamental" liberty guaranteed by the Constitution; such status is reserved for basic liberties involving intimate and personal choices such as procreation and family life. As a result, assuming (First Amendment considerations aside) that the right to wear headgear is constitutionally protected, the school system's encroachment of that right is be examined under the traditional standard of review, "which requires only that the challenged state action be shown to bear some rational relationship to legitimate state purposes." *Herndon v. Chapel Hill–Carrboro City Bd. of Educ.,* 89 F.3d 174, 177 (4th Cir.1996) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 37–40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)).

In *Massie v. Henry,* 455 F.2d 779, 783 (4th Cir.1972), the Fourth Circuit found that a person's right to wear his hair as he wishes is "an aspect of the right to be secure in one's person guaranteed by the due process clause." Although the distinctions between hairstyle and clothing are evident, it can be assumed for the purposes of this opinion that, under *Massie,* the right to wear headgear is also implicated by the "right to be secure in one's person." Clearly, however, a public school's restrictions on headgear are far less intrusive on this personal freedom than similar restrictions on hairstyle. Headgear, like other clothing and unlike hair, is easily removed and replaced. Shermia is free to wear her headwrap outside of school and, apparently, is even free to wear the headwrap to and from school. The school rules simply require that she leave the headwrap in her locker during the school day.

Moreover, as the Fourth Circuit noted in *Massie,* the determination that Shermia's right to wear headgear is entitled to some constitutional protection does not end the inquiry.

> Personal freedoms are not absolute; they must yield when they intrude upon the freedoms of others. Our task, therefore, is to weigh the competing interests asserted here. In doing so, we proceed from the premise that the school administration carries the burden of establishing the necessity of infringing upon [the] freedom in order to carry out the educational mission of the ... School.

*Massie,* 455 F.2d at 783 (quoting *Bishop v. Colaw,* 450 F.2d 1069, 1075 (8th Cir.1971)).

In determining whether the school administration has met the burden *Massie* imposes upon it, I note that courts generally refrain from interfering with the administration of public education. *See Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."). Proper deference to educators' judgment reflects an appreciation of the difficult tasks performed by teachers and administrators in public schools. The reasons advanced by the school system for its "no hats" restriction sufficiently and reasonably establish the need for the restriction's relatively minor infringement of personal freedom. The school's purpose of creating a safe, respectful, focused educational environment unquestionably is legitimate, and the reasons for the rule, as discussed above, are rationally related to that purpose.

It is true, as Shermia argues, that her headwrap may lack some of the characteristics that make other hats particularly disruptive. For example, it is less likely to block her face than other hats, and it would be harder to remove and throw around in a hallway or classroom. It is also true that the headwrap did not cause any notable disturbances in the few hours that Shermia wore it at school. Therefore,

the school system's concerns, as they apply to Shermia's headwrap, are all "potential problems" rather than documented ones. However, the administrators' testimony clearly demonstrates that their concerns are well-founded and based on prior experience.

Shermia's headwrap (which from the photo in the record appears to rise several inches above the top of her head) would clearly obstruct other students' view of the blackboard and the teacher's view of students seated behind Shermia. Despite the fact that a headwrap is harder to pull off than a hat or a cap, the very nature of middle and high-school students makes them relatively likely to attempt to pull off or unwrap the headwrap and use it as a toy. Finally, while there is no indication that Shermia (an excellent student with an exemplary disciplinary record) would engage in such activity, it would be entirely possible for other students to hide drugs, beepers or cheat sheets in a similar headwrap.

The facts that none of these problems arose in the few hours that Shermia wore her headwrap in school, and have never arisen with any other headwrap, are not dispositive. There is no evidence that any other student has worn a headwrap to school in Howard County. Shermia only wore one for a few hours. No one contends that a hat or a headwrap would be constantly disruptive in class. However, the relative likelihood of disruption is great enough to justify the school system's decision to bar hats from the classroom. Furthermore, it would be entirely unrealistic to ask school administrators (along with the multitude of educational decisions that they must make daily) to decide on a hat-by-hat basis whether a particular hat poses sufficient danger of disruption. Shermia's argument that they be required to do so underscores the unreasonableness of her position.

For these reasons, defendants' motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. A separate order to that effect is being entered herewith.

### ORDER

For the reasons stated in the memorandum entered herewith, it is, this 30th day of March, 1999

ORDERED that

1. defendants' motion for summary judgment is granted;

2. plaintiff's motion for summary judgment is denied; and

3. judgment is entered in favor of defendants against plaintiff.