CITY CHAPEL EVANGELICAL FREE INC., a/k/a City Chapel Evangelical Free Church, Defendant–Appellant,

v.

CITY OF SOUTH BEND, Indiana on behalf of its DEPARTMENT OF RE-DEVELOPMENT, Plaintiff–Appellee.

No. 71S00–0008–CV–501.

Supreme Court of Indiana.

March 29, 2001.

James A. Masters, Nemeth, Feeney, Masters, Hosinski & Devetski, P.C., South Bend, IN, Attorney for Appellant.

Cheryl A. Greene, City of South Bend, South Bend, IN, Attorney for Appellee.

## ON PETITION FOR INTERLOCUTORY APPEAL

DICKSON, Justice.

In this appeal, the defendant-appellant, City Chapel Evangelical Free Inc., also known as City Chapel Evangelical Free Church (hereinafter "City Chapel"), challenges a trial court's interlocutory order overruling its objections[1] to proceedings to condemn real estate initiated by the defendant-appellee, City of South Bend, Indiana (hereinafter "South Bend"). After this appeal was initiated, this Court granted transfer pursuant to Ind.Appellate Rule 4(A)(9) upon the request of both parties and their agreement that this appeal involves a substantial question of law of great public importance and that an emergency exists for speedy determination. City Chapel seeks a remand to the trial court for an evidentiary hearing on its claims that South Bend's taking of its place of worship violates state and federal constitutional provisions protecting rights of free exercise of religious worship and assembly.[2]

The essential facts are not disputed. City Chapel, including its sanctuary, religious ministry rooms, and administrative offices, is located in a four-story brick building formerly used as a retail store. The building is one of three buildings located in a quarter block area at the corner

---

1. Pursuant to Ind.Code § 32–11–1–5, a defendant in a condemnation action "may object to such proceedings on the grounds that the court has no jurisdiction either of the subject-matter or of the person, or that the plaintiff has no right to exercise the power of eminent domain for the use sought, or for any other reason disclosed in the complaint or set up in such objections." In the event such objections are overruled, such defendant may initiate an immediate appeal. *Id.*

2. Noting that City Chapel's objections included claims that the proceedings violated Article

1 of the Indiana Constitution and the Free Exercise Clause of the First Amendment of the United States Constitution, the trial court ruled that City Chapel "is not entitled to an evidentiary hearing on its constitutional challenges to the taking." Record at 108. The court's ruling was based on its conclusion that "the Indiana eminent domain laws pursuant to which the City of South Bend seeks to take City Chapel's property are religious-neutral laws of general applicability and that the city is not required to demonstrate a compelling government interest." *Id.*

of Jefferson Boulevard and Main Street that South Bend seeks to acquire for redevelopment. City Chapel was founded in 1994 to open a church and conduct a religious ministry in the downtown area of South Bend. It has a congregation of approximately one hundred members. Since acquiring the building in December, 1995, City Chapel has used it for twice-a-week worship services, Sunday school, the pastor's office, and other purposes of City Chapel's religious ministry. The building's upper floors are used as a parking garage.

## I. Indiana Constitution

City Chapel contends that the condemnation proceeding violates its rights of free exercise of religious worship and assembly which are protected by Sections 2, 3, and 4 of Article 1, the Bill of Rights, of the Indiana Constitution, which provide as follows:

Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences.

Section 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.

Section 4. No preference shall be given, by law, to any creed, religious society, or mode of worship; and no person shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent.

City Chapel asserts that the "issue is whether the state can use its power of eminent domain to take a church without a court conducting a hearing to balance the competing interests of the state and the church." Appellant's Br. at 8 (footnote omitted). Claiming that South Bend's condemnation proceeding involves not "just a property interest in the church building .... [but] infringes upon the congregation's use of the church building for the free exercise of religious worship and assembly," City Chapel asserts that the taking "will destroy the church." *Id.* at 8, 10.

City Chapel urges that, under the Indiana Constitution, South Bend cannot take City Chapel's building without a hearing at which South Bend is required to prove "that the need or benefit which occasions its use of [the] police power [of eminent domain] outweighs the restrictions imposed on City Chapel's fundamental rights of freedom of worship and assembly." *Id.* at 25–26.

City Chapel contends that the Indiana Constitution protects core constitutional values which South Bend may not materially burden. It argues that the taking of its church building by condemnation would burden its right to religious worship under Section 2 and its right to free exercise and enjoyment of religious opinions under Section 3. It further alleges that the rights guaranteed by Section 4 are burdened because South Bend, by pursuing this action against City Chapel but permitting another church located in a redevelopment district to remain, gives preference to a religious society or mode of worship.

South Bend principally argues that the Indiana Constitution's guarantees of religious protection should be equated with that provided in the First Amendment of the United States Constitution and that, because South Bend's condemnation action is religion-neutral, no balancing test and thus no hearing is required. South Bend also urges that, even if Sections 2 and 3 of Article 1 of the Indiana Constitution provide religious protections that exceed those of the First Amendment, they only apply to the "personal devotional aspect of religion" and that the "incidental relocation" of the City Chapel building does not interfere with these rights. Appellee's Br. at 22. South Bend also asserts that the only constitutional inhibition on the taking of private property for public use is the requirement of just compensation.

When Indiana's present constitution was adopted in 1851, the framers who drafted it and the voters who ratified it did not copy or paraphrase the 1791 language

of the federal First Amendment.[3] Instead, they adopted seven separate and specific provisions, Sections 2 through 8 of Article 1, relating to religion. Clearly, the religious liberty provisions of the Indiana Constitution were not intended merely to mirror the federal First Amendment.[4] We reject the contention that the Indiana Constitution's guarantees of religious protection should be equated with those of its federal counterpart and that federal jurisprudence therefore governs the interpretation of our state guarantees.

While it prohibits government interference with religious liberty, the Indiana Constitution also affirmatively recognizes the state's police power. It declares that government is "instituted for [the People's] peace, safety, and well-being." IND. CONST. art. 1, § 1. The Constitution's Preamble expressly declares its purposes to be "that justice be established, public order maintained, and liberty perpetuated." Although it does not expressly grant to the state the power of eminent domain, the Indiana Constitution acknowledges this power by implication in Article 1, Section 21, which provides in part that "No person's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered." In today's case, this governmental police power of eminent domain challenges the limitations on government in the religious liberty provisions.

The analysis is guided by *Price v. State*, 622 N.E.2d 954 (Ind.1993), in which Chief Justice Shepard explained:

[I]n Indiana the police power is limited by the existence of certain preserves of human endeavor, typically denominated as interests not 'within the realm of the police power,' upon which the State must tread lightly, if at all. Put another way, there is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate. A right is impermissibly alienated when the State materially burdens one of the core values which it embodies.

*Id.* at 960 (citations omitted). Fifteen years earlier, our Court of Appeals had similarly observed that "churches are subject to such reasonable regulations as may be necessary to promote the public health, safety, or general welfare," but that "[r]easonable restrictions, however, are not tantamount to exclusion." *Church of Christ v. Metropolitan Bd. of Zoning App.*, 175 Ind. App. 346, 351, 371 N.E.2d 1331, 1334 (1978)(quotations marks and citations omitted). Holding that the Board contravened Article 1 of the Indiana Constitution by excluding a church from a residential area, the court declared:

Denial by the City of Indianapolis of the use of this residential property for religious purposes presents the classic confrontation between exercise of the police power and a fundamental constitutional right. If the citizen fails to heed Wendell Phillip's admonition that "Eternal vigilance is the price of liberty," encroaching government may devour that fundamental right (and what is more fundamental than freedom of religion, which is a vital part of freedom of thought?). Wittingly or unwittingly, the City of Indianapolis has been guilty of such an encroachment.

*Id.* at 349–50, 371 N.E.2d at 1334. As emphasized in *Whittington v. State*, 669 N.E.2d 1363 (Ind.1996), "[t]he purpose of state power, then, is to foster an atmo-

---

**3.** The First Amendment provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I.

**4.** We observe further that Article 1, Section 5 of the Indiana Constitution ("No religious test shall be required as a qualification for any office of trust or profit") is similar but not identical to its federal counterpart in Article 6 of the United States Constitution ("no religious test shall ever be required as a qualification to any office or public trust under the United States").

sphere in which individuals can fully enjoy that measure of freedom they have not delegated to government." *Id.* at 1368.

■ The underlying issue sought to be presented is thus whether South Bend's proposed taking of City Chapel's building under the state's police power of eminent domain is a prohibited material burden, in contrast to a permissible qualification, upon the core values of the religious protection clauses asserted by City Chapel. South Bend's condemnation proceedings will amount to a material burden upon a core value "[i]f the right, as impaired, would no longer serve the purpose for which it was designed." *Price*, 622 N.E.2d at 960 n. 7. The "material burden" analysis looks only to the magnitude of the impairment and does not take into account the social utility of the state action at issue. *Id.*

Our methodology for interpreting and applying provisions of the Indiana Constitution is well established. It requires:

> a search for the common understanding of both those who framed it and those who ratified it. Furthermore, the intent of the framers of the Constitution is paramount in determining the meaning of a provision. In order to give life to their intended meaning, we examine the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions. In construing the constitution, we look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the

mischief, and the remedy. The language of each provision of the Constitution must be treated with particular deference, as though every word had been hammered into place.

*McIntosh v. Melroe Co.*, 729 N.E.2d 972, 986 (Ind.2000)(Dickson, J., dissenting)(quotations marks and citations omitted).

Sections 2, 3, and 4 of the 1851 Indiana Constitution's Bill of Rights did not differ substantially from their predecessor provisions in Indiana's first Constitution, adopted in 1816.[5] The remarks of the delegates during the 1850–51 Constitutional Convention amplify our understanding of the framers' purposes, but do not alter the literal meaning of the text of these sections.

When the convention debated Section 2, it considered an amendment to substitute "possess" for "be secured" in the phrase "All men shall be secured in the natural and indefeasible right to worship ...," the language initially proposed by the committee on rights and privileges. JOURNAL OF THE CONVENTION OF THE PEOPLE OF THE STATE OF INDIANA at 165 (reprint 1936)(1851) [hereinafter JOURNAL]. Defending the committee's draft, its chairman, Robert Dale Owen, a delegate from Posey County, asserted:

> No legislature could ever refuse to secure to the people this right without a manifest violation of the Constitution,.... We provide here in our organic law that all men shall be secured in the right to worship Almighty God, etc. We intended by this that they should be so secured, and it will be the duty of the Legislature to enact such laws as will

---

5. *Compare* IND. CONST. art. 1, § 2 (1851)("All men shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences."), *with* IND. CONST. of 1816 art. I, § 3 ("That all men have a natural and indefeasible right to worship Almighty God, according to the dictates of their own consciences"); *compare* IND. CONST. art. 1, § 3 (1851)("No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience."), *with* IND. CONST. of 1816 art. I, § 3 ("That no human authority can, in any case whatever, control or interfere with the rights of conscience"); *compare* IND. CONST. art. 1, § 4 (1851)("No preference shall be given, by law, to any creed, religious society, or mode of worship; ..."), *with* IND. CONST. of 1816 art. I, § 3 ("no preference shall ever be given by law to any religious societies, or modes of worship; ...").

prevent any and every religious society from being disturbed in their worship. REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF INDIANA 965 (reprint 1935) (1850) [hereinafter DEBATES]. Likewise urging the use of "shall be secured" as proposed by the committee, Delegate John B. Howe of LaGrange County explained its meaning:

It means, that, inasmuch as all men have a right to worship God according to their own creed, they shall be protected in that right. . . . The object of the provision is, that the law should recognize the right and protect it by proper legislation; that is all. It is simply tying up the hands of the Legislature so that they cannot decree otherwise.

*Id.* The convention retained the "shall be secured" language proposed by the committee.

We find no evidence that the principal terms were understood by the framers and ratifiers to have meanings contrary to present usage. Contemporaneous with the convention, the word "secure" was defined as: "To make certain, to put beyond hazard." NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 1000 (Mass., George & Charles Merriam 1856). The word "worship" was defined to mean: *"chiefly and eminently,* the act of paying divine honors to the Supreme Being; or the reverence and homage paid to him in religious exercises consisting in adoration, confession, prayer, thanksgiving, and the like. . . . To perform acts of adoration; to perform religious service." *Id.* at 1273 (emphasis in original).

The delegates adopted Section 3 ("No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.") without debate as proposed by the committee on rights and privileges. While the convention discussions do not assist. us in interpreting this section, the text, however, is clear and unequivocal. The inclusion of the phrase "in any case whatever" demonstrates the framers' and ratifiers' intent to provide unrestrained protection for the articulated values. Like Section 3, there is little from the convention debates to amplify our understanding of the language of Section 4 ("No preference shall be given, by law, to any creed, religious society, or mode of worship; and no man shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent." [6]). The text of Sections 2, 3, and 4 is thus our primary source for discerning the common understanding of the framers and ratifiers.

Asserting that the relocation of City Chapel's church does not impinge upon City Chapel members' rights of conscience or ability to worship according to the dictates of conscience, South Bend contends that the Indiana Constitution's guarantees protect only the "personal devotional aspect of religion." Appellee's Br. at 22. We understand this argument essentially to urge that the core values of Sections 2 and 3 encompass only the "personal devotional aspect" of worship.

At the time of the adoption of the religious liberty provisions of the Indiana Constitution's Bill of Rights, religious worship and the exercise of religious opinion was largely a collective activity, practiced in diverse traditions by a variety of religious denominations. During the years between its admission to statehood and the Constitutional Convention of 1850–51, Indiana's population multiplied over fifteenfold. When the Indiana territory conducted a special census in 1815 as a pre-

---

**6.** As originally drafted and proposed by the committee on rights and privileges, the section included the phrase "No discrimination shall be made by law between religious societies, nor preference be given by law to any mode of worship." JOURNAL at 166. The present language, drawn from the original 1816 Constitution, resulted from an amendment offered by Delegate John S. Newman of Wayne County. *Id.* at 349. This change is not significant to the issue before us.

requisite to petitioning for statehood, it had a population of 63,897. 1 CHARLES KETTLEBOROUGH, CONSTITUTION MAKING IN INDIANA 1780–1851 at 65 (1916). By 1850, the year before Indiana adopted its current constitution, the population was 988,416. THE SEVENTH CENSUS OF THE UNITED STATES: 1850 at 756 (1853). The influx of settlers into Indiana reflected the "whole range of religious belief and practice," and "there was no religious unity from the beginning and denominations had no restraints." L.C. RUDOLPH, HOOSIER FAITHS at x (1995). While Christianity was the predominant faith, the various denominations "engaged in flat-out, wide-open competition." *Id.* By 1850, Indiana included a variety of religious communities, including Methodist, Baptist, Presbyterian, Roman Catholic, Quaker, Lutheran, Jewish, United Brethren, and Disciples of Christ. *See generally* JAMES H. MADISON, THE INDIANA WAY 98–104 (1986). Professor Madison also observes that many Indiana residents at the time were unaffiliated with any religious congregation, and notes that two of the delegates to the Indiana Constitutional Convention, Robert Dale Owen and John Pettit, were considered "freethinkers." *Id.* at 99. The framers' and ratifiers' respect for the variety of religious opinions and practices is underscored by their inclusion in the Bill of Rights of Section 7 ("No person shall be rendered incompetent as a witness, in consequence of his opinions on matters of religion.") and Section 8 ("The mode of administering an oath or affirmation shall be such as may be most consistent with, and binding upon, the conscience of the person, to whom such oath or affirmation may be administered.").

Even by the time of Indiana's initial Constitution in 1816, religious liberty provisions in other states were broadly construed. Between 1776 and 1780 eleven of the original states adopted new constitu-

tions and by 1789, every state except Connecticut had adopted constitutional provisions protecting religious freedom. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion,* 103 HARV.L.REV. 1409, 1455 (1990). The language used in these original free exercise provisions "defined the scope of the free exercise right in terms of the conscience of the individual believer and the actions that flow from that conscience [and][n]one of the provisions confined the protection to beliefs and opinions...." *Id.* at 1458–59. Eight of the states confined the protection of conduct to acts of "worship" in contrast to the other states which used broader language such as "practice" (Maryland) and "religious concernment" (Rhode Island). *Id.* at 1459–60. The term "exercise" was defined in the relevant time period as connoting "action." *Id.* at 1459.[7] As noted by South Bend,[8] *Smith v. Pedigo,* 145 Ind. 361, 33 N.E. 777 (1893), provides one of the earliest interpretations by the Indiana Supreme Court of the Indiana Constitution's provisions concerning religion. Although not directly pertinent to its holding in a case wherein two doctrinally disagreeing factions of a single congregation sought sole possession of the church building, the Court generally observed that the religious liberty clauses "take away all power of the State to interfere with religious beliefs" and that, "[i]n other words, the law allows every one [sic] to believe as he pleases, and practice that belief so long as that practice does not interfere with the equal rights of others." *Id.* at 365, 33 N.E. at 779. By observing that the provisions protect both "belief" and "practice," the *Pedigo* court understood that the Constitution guarantees more than just the "personal devotional aspect of religion" as advanced by South Bend. Appellee's Br. at 22.

---

7.  The American Edition of Samuel Johnson's A DICTIONARY OF THE ENGLISH LANGUAGE (Phila.1805) defined "exercise" as "labour of the body," "use; actual application of any thing," "task; that which one is appointed to per-

form," and "Act of divine worship whether public or private." *Id.*

8.  Appellee's Notice of Add'l Authorities at 2.

From the literal text of Sections 2 and 3, the discussions at the Constitutional Convention, and the surrounding circumstances, we conclude that the framers and ratifiers of the Indiana Constitution's religious liberty clauses did not intend to afford only narrow protection for a person's internal thoughts and private practices of religion and conscience. By protecting the right to worship according to the dictates of conscience and the rights freely to exercise religious opinion and to act in accord with personal conscience, Sections 2 and 3 advance core values that restrain government interference with the practice of religious worship, both in private and in community with other persons.

As an additional argument, South Bend contends that the only constitutional inhibition on the taking of private property for public use is the requirement of just compensation. In *Consumers' Gas Trust Co. v. Harless*, 131 Ind. 446, 29 N.E. 1062 (1892), this Court stated:

The right of eminent domain is limited only by the Constitution, and the only limitation in this State is, that no man's property shall be taken by law without just compensation; nor, except in case of the State, without such compensation first assessed and tendered. Section 21, article 1, Constitution of the State.

It is to be exercised only when the public necessity or convenience requires it, but when such necessity or convenience is declared by the representative of the sovereign, the Legislature, courts cannot question the wisdom of such declaration.

*Id.* at 451, 29 N.E. at 1063–64. However, in both *Harless* and *Schnull v. Indianapolis Union Ry. Co.*, 190 Ind. 572, 572, 131 N.E. 51, 52 (1921), which reiterates this proposition, the issue was the "just compensation" to be paid and the means by which it was tendered, not whether the

state's action was in potential conflict with a specific constitutional guarantee of liberty. The language in *Harless* and *Schnull* does not authorize the State to ignore other provisions of the constitution when acting pursuant to its powers of eminent domain.

As the defendant in a condemnation proceeding, City Chapel is expressly authorized to object on the grounds that South Bend "has no right to exercise the power of eminent domain for the use sought, or for any other reason disclosed in the complaint or set up in such objections." Ind.Code § 32–11–1–5.[9] A condemnation defendant may seek judicial review as to the legality of the proceedings and whether the condemning entity has the legal authority and right to condemn. *State ex rel. Ind. Dept. of Conserv. v. Barber*, 246 Ind. 30, 35–36, 200 N.E.2d 638, 641 (1964); *City of Evansville v. Reising*, 547 N.E.2d 1106, 1111, 1114–15 (Ind.Ct. App.1989). We hold that City Chapel may present objections to the condemnation proceeding on the basis of claimed violations of the state constitution.

As we held in *Price*, the police power of the State is limited and may not materially burden one of the core values embodied within each provision of the Bill of Rights of Indiana's Constitution. The power of eminent domain is a police power subject to this limitation. In this case, because South Bend seeks to take property the loss of which City Chapel claims will materially burden its rights embodied in the core values of Sections 2, 3, and 4 of Article 1 of the Indiana Constitution, City Chapel is entitled to an opportunity to present this claim.

In City Chapel's challenge to South Bend's otherwise lawful condemnation proceedings instituted pursuant to express statutory authorization, the condemnation

9. The objection filed by City Chapel alleged in part that South Bend's attempt to take City Chapel's property by condemnation "is an unconstitutional interference" with City Chapel's religious freedom rights under the First Amendment to the United States Constitution and under Article 1 of the Indiana Constitution. Record at 28–29.

procedure will be presumed to be constitutional; City Chapel must clearly overcome that presumption by a contrary showing; and, as the challenging party, City Chapel bears the burden of proof with all doubts to be resolved against it. *See Boehm v. Town of St. John,* 675 N.E.2d 318, 321 (Ind.1996); *State v. Hoovler,* 668 N.E.2d 1229, 1232 (Ind.1996).

City Chapel must establish its contention that the taking of its church building by condemnation, under the circumstances presented in this case, materially burdens its members' right to worship according to the dictates of conscience, the right freely to exercise religious opinions and rights of conscience, or the right to be free from a government preference for a particular religious society or mode of worship. The effect of the taking must constitute a material burden, not merely a permissible qualification, upon the core values of the clauses asserted by City Chapel. *Price,* 622 N.E.2d at 960. Considering only the magnitude of the impairment and excluding any consideration for the social utility of the proposed condemnation, the taking will constitute a material burden on a core value only "[i]f the right, as impaired, would no longer serve the purpose for which it was designed...." *Id.* at 960 n. 7. Although its constitutional challenge carries a very substantial burden of proof, City Chapel is entitled to an opportunity to present its claim for judicial determination.

## II. Federal Constitution

■ Distinct from City Chapel's claims under the Indiana Constitution, it also claims that South Bend's taking of its church building violates its rights to free exercise of religion and freedom of association[10] under the First Amendment of the Constitution of the United States. As to this Part II, only Justice Rucker has concurred, and this Part of the opinion thus represents the view of only two justices.

Although differing as to rationale, Chief Justice Shepard, Justice Sullivan, and Justice Boehm ultimately agree that City Chapel is not entitled to a hearing as to its federal First Amendment claims.

City Chapel contends that the trial court erred in applying the Supreme Court's decision in *Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), to find that South Bend's use of statutory condemnation proceedings to take City Chapel's church is a permissible use of religious-neutral laws of general applicability, and that South Bend is not required to demonstrate a compelling government interest. City Chapel argues that, because its First Amendment claim is based on the Free Exercise Clause in conjunction with the freedom of association, it falls within the "hybrid" claim exception recognized under *Smith.* Because of this, City Chapel urges that South Bend's taking of its church building is governed by the "compelling interest" test enunciated in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). City Chapel argues that it is entitled to a hearing in which the court must determine whether South Bend meets this burden of proof.

South Bend acknowledges the hybrid claim exception language in *Smith,* but argues that the right to free exercise of religion and the right to freedom of association for religious worship are not separate rights that give rise to a hybrid claim, but rather are both encompassed in the same right to the free exercise of religion. South Bend also argues that the hybrid analysis exception has received much criticism and that cases applying *Smith* have not treated free exercise and free association claims as qualifying for the hybrid claim exception. South Bend asserts that Indiana's eminent domain law is generally

---

**10.** City Chapel refers to this claim in various ways, *e.g.* the right to assemble for worship, the right of assembly, and the freedom of association. Noting this variation, South Bend interprets and addresses the claim as one of freedom of association. Appellee's Br. at 13 n. 8. City Chapel confirms this understanding. Appellant's Reply Br. at 1.

applicable and religion-neutral and that an evidentiary hearing is unnecessary.

In the absence of the hybrid claim exception, the First Amendment's protection of free exercise of religion is generally governed by the proposition that a "law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Church of The Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472, 489 (1993)(citing *Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876).

City Chapel's contention that it qualifies for the hybrid claim exception is based on the following language in *Smith:*

> The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, . . . . Some of our cases prohibiting compelled expression, decided exclusively upon free speech grounds, have also involved freedom of religion, . . . . And it is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns.
>
> The present case does not present such a hybrid situation, but a free exercise claim unconnected with any communicative activity or parental right.

494 U.S. at 881–82, 110 S.Ct. at 1601–02, 108 L.Ed.2d at 887–88. Finding that the facts presented did not present such a hybrid situation, the *Smith* Court explained that there is "no contention that the [state] law represents an attempt to regulate religious beliefs, the communication of religious beliefs, or the raising of one's children in those beliefs . . . ." *Id.* at 882, 110 S.Ct. at 1602, 108 L.Ed.2d at 888.

In "envisioning" a case raising both freedom of association and free exercise, the *Smith* Court directs us to *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984): " 'An individual's freedom to speak, to *worship*, and to petition the government for redress of grievances could not be vigorously protected from interference by the State [if] a correlative freedom to engage in group effort toward those ends were not also guaranteed.' " *Smith*, 494 U.S. at 882, 110 S.Ct. at 1602, 108 L.Ed.2d at 888, (emphasis added)(quoting *Roberts*, 468 U.S. at 622, 104 S.Ct. at 3252, 82 L.Ed.2d at 474). In *Roberts*, this correlative freedom is termed the right to associate for expressive purposes, 468 U.S. at 623, 104 S.Ct. at 3252, 82 L.Ed.2d at 475, and is "recognized [as] a right to associate for the purpose of engaging in those activities protected by the First Amendment speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618, 104 S.Ct. at 3249, 82 L.Ed.2d at 471.

In the ten years since *Smith*, the Supreme Court has not again addressed the hybrid claim issue except for Justice Kennedy's brief observation that "[t]he only instances where a neutral, generally applicable law had failed to pass muster, the *Smith* court noted, were cases in which other constitutional protections were at stake." *City of Boerne v. Flores*, 521 U.S. 507, 513–14, 117 S.Ct. 2157, 2161, 138 L.Ed.2d 624, 634 (1997). The issue has, however, received considerable attention in other federal and state courts. Although arguably not uniformly construed and applied, the hybrid claim exception has been acknowledged in all the federal circuits.[11]

---

11. *First Circuit: Brown v. Hot, Sexy & Safer Prod., Inc.*, 68 F.3d 525 (1st Cir.1995) (recognizing hybrid claim of free exercise in conjunction with parental right to direct upbringing of children but finding state action was a one-time occurrence and not affecting entire way of life); *Second Circuit: Krafchow v. Town of Woodstock*, 62 F.Supp.2d 698 (N.D.N.Y.1999) (recognizing hybrid claim of free exercise and free speech and applying

State courts addressing the issue have also acknowledged the legitimacy of hybrid claims.[12]

While acknowledging the potential of a hybrid right exception to the general rule announced in *Smith*, South Bend maintains that freedom of association to worship is a derivative right of the free exercise of religion and not a separate or additional right that can be used to qualify for the hybrid claim exception. It cites *Salvation Army v. Dept. of Cmty. Affairs*, 919 F.2d 183 (3d Cir.1990), in which the Third Circuit addressed a freedom to associate for religious purposes claim by the Salvation Army as justification for being exempt from reporting requirements. The court agreed that the Salvation Army had a "constitutionally secured right to associate for religious purposes," *id.* at 199, but found that this did not entitle it to an exception from a neutral, generally applicable law because the right to associate for religious pur-

---

compelling interest test, but finding that plaintiff did not prove substantial interference with belief); *Third Circuit: Salvation Army v. Dept. of Cmty. Affairs*, 919 F.2d 183 (3d Cir. 1990) (acknowledging plaintiff's hybrid claim of free exercise and freedom to associate for religious purposes but rejecting claim on grounds that the alleged association right is derivative of the free exercise right); *Fourth Circuit: Reich v. Shiloh True Light Church of Christ*, No. 95–2765, 1996 WL 228802 (4th Cir. May 7, 1996)(per curiam)(recognizing hybrid right of free exercise and parental right and applying compelling interest test, but finding claim fails); *Hicks ex rel. Hicks v. Halifax County Bd. of Educ.*, 93 F.Supp.2d 649 (E.D.N.C.1999)(recognizing hybrid claim of free exercise and parental right to direct upbringing of child); *Isaacs ex rel. Isaacs v. Board of Educ.*, 40 F.Supp.2d 335 (D.Md. 1999) (recognizing existence of hybrid claims); *Fifth Circuit: Chalifoux v. New Caney Indep. Sch. Dist.*, 976 F.Supp. 659 (S.D.Tex.1997) (finding First Amendment violation by school dress code as hybrid claim of free speech and free exercise); *Sixth Circuit: Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927 (6th Cir.1991) (recognizing hybrid right analysis, but requiring that companion right be a cognizable constitutional right); *but see Kissinger v. Bd. of Trustees*, 5 F.3d 177, 180 (6th Cir.1993) (declining to recognize hybrid claim exception until clarified by Supreme Court); *Seventh Circuit: Hinrichs v. Whitburn*, 772 F.Supp. 423 (W.D.Wis.1991) (acknowledging hybrid claim of free exercise and parental direction but finding issue not ripe), *aff'd* 975 F.2d 1329 (7th Cir.1992); *Eight Circuit: Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464 (8th Cir.1991) (recognizing hybrid rights claim in zoning case); *Ninth Circuit: Miller v. Reed*, 176 F.3d 1202 (9th Cir.1999) (recognizing hybrid claim jurisprudence but holding that companion claim must be a violation of a fundamental right); *American Friends Serv. Comm. Corp. v. Thornburgh*, 961 F.2d 1405 (9th Cir.1991) (acknowledging hybrid claim of free exercise and

"right to employ" but finding "right to employ" neither expressly protected by the Constitution nor a firmly recognized substantive due process right); *Tenth Circuit: Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I–L*, 135 F.3d 694 (10th Cir.1998)(recognizing hybrid claim exception but finding that claim of free exercise and parental right fails because claim of parental right to direct school curricula does not present a colorable claim), *Thiry v. Carlson*, 78 F.3d 1491 (10th Cir.1996) (acknowledging hybrid claim exception but finding no infringement of proposed liberty interests of family unity and integrity); *D.C. Circuit: EEOC v. Catholic University of America*, 83 F.3d 455 (D.C.Cir.1996) (acknowledging hybrid claim raised as defense to sex discrimination suit filed against religious high school but deciding case on ministerial exception alone).

12. *Hill–Murray Fed. of Teachers v. Hill–Murray High Sch.*, 487 N.W.2d 857 (Minn.1992)(recognizing hybrid situation language but finding no applicability to these facts, but retaining compelling state interest balancing test under state constitution); *Health Serv. Div. v. Temple Baptist Church*, 112 N.M. 262, 814 P.2d 130 (1991)(acknowledging hybrid rights language, but finding no exception to *Smith's* holding as Church could not assert parental right to direct children's education); *New York State Emp. Rel. Bd. v. Christ the King Reg'l High Sch.*, 90 N.Y.2d 244, 660 N.Y.S.2d 359, 682 N.E.2d 960 (1997) (acknowledging hybrid claim language, but finding it inapplicable where school asserting parental rights); *First United Methodist Church of Seattle v. Hearing Examiner for Seattle Landmarks Pres. Bd.*, 129 Wash.2d 238, 916 P.2d 374 (1996)(recognizing hybrid rights exception where church claimed infringement of free exercise and free speech); *First Covenant Church of Seattle v. City of Seattle*, 120 Wash.2d 203, 840 P.2d 174 (1992)(accepting hybrid claim of free exercise and free speech).

poses is derivative of the right to free exercise. *Id.*

*Smith* itself instructs to the contrary by suggesting that the hybrid claim exception may arise from correlative claims of freedom of association and free exercise of religion. The right to freedom of expressive association is the right to "associate with others, in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts,* 468 U.S. at 622, 104 S.Ct. at 3252, 82 L.Ed.2d at 474. As noted above, in foreseeing a possible hybrid claim, *Smith* cites specific language in *Roberts* that recognizes the freedom to engage in group effort toward worship as an example of the right of expressive association. *Smith,* 494 U.S. at 882, 110 S.Ct. at 1602, 108 L.Ed.2d at 888. No basis is provided in *Smith* to hold that the hybrid claim exception is disqualified when the expressive association claim is based on religious expression. To the contrary, *Smith* thus suggests that correlative claims based on the right to free exercise of religion and the right of expressive association to worship exemplify the hybrid right exception. The Supreme Court's creation and description of the exception, from which it has not since retreated, cannot be ignored.

The trial court erred in denying a hearing on whether South Bend's taking of City Chapel's church building presents a First Amendment challenge on freedom of association grounds reinforced by Free Exercise Clause concerns. In the event of a hearing, however, to qualify for the this hybrid claim exception, City Chapel would have to demonstrate at the hearing that South Bend's taking of its church building would both (1) significantly affect or burden its members' right to expressive association, *see Boy Scouts of America v. Dale,* 530 U.S. 640, 120 S.Ct. 2446, 2452–53, 147 L.Ed.2d 554, 564–66 (2000), and (2) substantially burden a religious practice, *City of Boerne,* 521 U.S. at 513, 117 S.Ct. at 2160–61, 138 L.Ed.2d at 634 (quoting *Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1795, 10

L.Ed.2d at 972). If City Chapel were thus able to establish that it qualified for the hybrid claim exception, South Bend's condemnation proceedings would survive City Chapel's First Amendment challenge only if South Bend satisfied the requirements in *Sherbert* that some compelling government interest justifies the substantial infringement. *Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 972.

### III. Conclusion

We reverse the trial court's order overruling City Chapel's objections to condemnation based on religious liberty claims under the Indiana Constitution and remand this cause for consideration of those claims. As to City Chapel's claims under the First Amendment to the Constitution of the United States, a majority of this Court consisting of Chief Justice Shepard, Justice Sullivan, and Justice Boehm concludes that the trial court did not err in overruling those objections without holding a hearing.

This cause is remanded for a hearing on City Chapel's claims under the Indiana Constitution. As to the denial of a hearing on the federal First Amendment claims, the trial court is affirmed.

RUCKER, J., concurs. SHEPARD, C.J., concurs as to Part I but dissents as to Part II, with separate opinion concurring and dissenting. SULLIVAN, J., dissents, with separate opinion. BOEHM, J., dissents, with separate opinion.

SHEPARD, Chief Justice, concurring and dissenting.

I join in Justice Dickson's opinion insofar as it remands for an evidentiary hearing on City Chapel's claim that its rights under the Indiana Constitution trump the eminent domain power of the City of South Bend (though whether they actually do so is a question for some future day).

As for City Chapel's claim under the First Amendment, I am satisfied that it does not constitute a "hybrid claim" of the sort envisioned by the brief passage quot-

ed by Justice Dickson from *Employment Div. v. Smith*, 494 U.S. 872, 881–82, 110 S.Ct. 1595, 108 L.Ed.2d 876. Largely, I think Judge Walter Stapleton was right when he observed for the Third Circuit that assembling for purposes of worship is a derivative of free exercise of religion and, as a corporate exercise, not entitled to a greater level of First Amendment protection than individual exercise might command. *Salvation Army v. Dept. of Community Affairs*, 919 F.2d 183, 199 (3rd Cir.1990). I thus conclude that City Chapel loses on its First Amendment claim, though for reasons different from the ones identified by Justices Sullivan and Boehm.

SULLIVAN, Justice, dissenting.

When the City of South Bend attempted to use its eminent domain powers to acquire City Chapel's place of worship, City Chapel claimed that this use of eminent domain violated City Chapel's rights under the free exercise of religion clauses of the Indiana and federal constitutions.[1] City Chapel sought a hearing in the trial court on this claim. Finding no hearing required, the trial court found that the city's exercise of its eminent domain power did not violate City Chapel's rights under the free exercise clauses.

In this appeal, City Chapel *only* asks us to order such a hearing.

On appeal, City Chapel says its rights under the free exercise clauses were violated when the trial court did not grant it a hearing on its claims. The opinions of Justice Dickson, Chief Justice Shepard, and Justice Boehm each address City Chapel's claims as such. To me, City Chapel's appellate claim and my colleagues' analysis conflate two distinct issues with constitutional significance.

Whether City Chapel was entitled to a hearing or not is an entirely separate issue from whether City Chapel's free exercise rights were violated by the city's exercise of its eminent domain powers.

I think this case should be analyzed in the following way. First, we must answer as a matter of procedural law whether City Chapel was entitled to a hearing. If we conclude that City Chapel was entitled to a hearing, then I think that we must remand for such a hearing before we can reach the constitutional issues. Put differently, either the constitutional claim is ripe on the record for review—thereby invoking our power to say what the law is—or the claim is not ripe for our adjudication.

There are many potential sources for a right to a hearing in this case: the Indiana Trial Rules, the eminent domain statute, the due course of law provision of the Indiana Constitution, and procedural due process under the Fourteenth Amendment to the Federal Constitution, among others. However, City Chapel has failed to assert adequately a right to a hearing under any body of law. Instead, it skips the initial inquiry into the propriety of a hearing and concentrates exclusively on its rights under the free exercise clauses of the Indiana and federal constitutions.[2]

City Chapel also fails to set out what evidence would be offered on remand that is not available in the record. City Chapel's only reference to what it would present at a hearing is contained in the following passage in its reply brief:

> City Chapel is prepared to present evidence to the trial court that, in other redevelopment projects, the City of South Bend has not used its condemnation powers to take a church located in the redevelopment area. Instead the

---

1. U.S. Const. amend. I ("Congress shall make no law ... prohibiting the free exercise [of religion]"); Ind. Const. art. I, §§ 2, 3, 5, and 7.

2. Essentially, City Chapel asserts a right—free exercise of religion—and seeks a procedure

for vindicating that right—an evidentiary hearing—without any discussion of the propriety of that form of vindication. Its lengthy discussion of the underlying constitutional issues does not illuminate the necessary step of determining the efficacy of an evidentiary hearing in this context.

City of South Bend has allowed the church to remain in the redeveloped area. In this case, the City of South Bend's condemnation action is specifically directed to City Chapel and its mode of worship, because of its non-traditional style and location, in violation of Article I, Section 4 of the Indiana Constitution. Appellant's Reply Br. at 28. However, this passage in the brief cites two portions of the record where City Chapel's attorney made this exact point during oral argument to the trial court on the motion for an evidentiary hearing. The attorney also argued that the church could not afford to move to another location. While not technically "evidence," City Chapel's uncontested assertions put these points in the record and before the trial court.[3] Moreover, the lack of evidence to be gained by a hearing is put into sharper focus by the fact that South Bend accepted City Chapel's depiction of the relevant facts on appeal. Appellee's Br. at 3–4. Because of this failure, it is difficult to see what additional benefits would be had or interests served by remanding this case for an evidentiary hearing.

City Chapel's only claim in this appeal is that it was entitled to an evidentiary hearing. This case should have focused on the adequacy of City Chapel's assertion of such a right, not the free exercise of religion. Because I believe that City Chapel has not adequately demonstrated a right to an evidentiary hearing, I believe that my colleagues decide a series of issues that we have not been asked to decide. We should not do so.

I would affirm the trial court.

BOEHM, Justice, dissenting.

I respectfully dissent. I agree with the majority's conclusion that the various provisions of the Indiana Constitution dealing with religion prevent the State from imposing material burdens on the exercise of religious practice. I agree that this protection extends beyond the private devotion vel non of individuals and also includes the public and group activities associated with religious practices. And I agree that City Chapel is an organization whose activities seem to fall well within those protections. Thus, I agree that it follows that the City of South Bend, an arm of government, may not exercise its right of eminent domain in such a way as to materially burden City Chapel's religious activities.

I disagree, however, that City Chapel has presented a claim that raises this issue. To quote from City Chapel's brief, which in turn quotes from its presentation to the trial court:

[I]f we have an evidentiary hearing, what [the trial court will hear is] not just that this is an interference, this taking will destroy City Chapel … [The congregation] specifically wanted to be in the center of downtown, and specifically wanted to be in a visible site. … we had some various attempts to see if we could find an alternate location. [There will

---

**3.** This deficiency in City Chapel's argument must also be viewed through the procedural posture of the case. The trial court initially granted City Chapel's request for a hearing. After hearing oral argument on purely legal grounds, the trial court changed course and denied the hearing. This denial was based on South Bend's constitutional arguments, which means that the trial court implicitly determined that as a matter of law City Chapel could present no evidence that would override South Bend's power to condemn the building. We review such legal determinations de novo. *See Bader v. Johnson,* 732 N.E.2d 1212, 1216 (Ind.2000) ("[W]here the issue presented on appeal is a pure question of law, we review the matter de novo."). Under our de novo standard of review, we must view the record in the light most favorable to City Chapel. *Cf. Schulz v. State,* 731 N.E.2d 1041, 1043–44 (Ind.Ct.App.2000) (holding that under de novo review of a motion to dismiss, court must "evaluate the [facts] in the light most favorable to the plaintiff with every inference in [its] favor."), *transfer denied.* Because we may presume the facts that City Chapel has adequately asserted in its objections and at oral argument before the trial court, a hearing would not bring to light any information not already presented in the record.

be] testimony that there are almost no alternate locations for City Chapel either because of size or location, but most importantly because of price. There simply is no place else for them to go that we can find that they possibly can afford. . . .

(Emphasis added.). There is no claim here that the site has an independent religious significance. *Cf. Pillar of Fire v. Denver Urban Renewal Auth.,* 181 Colo. 411, 509 P.2d 1250, 1251–52 (1973) (sect sought to enjoin a municipal urban renewal agency from condemning a building said to be birthplace of the Pillar of Fire denomination). Rather, City Chapel's complaint is that its mission will be materially burdened because it cannot find a home consistent with its religious mission at a price it can afford. It seems to me that the Indiana Constitution has taken care of this problem. In addition to the provisions dealing with religious freedom, we also have Article I, Section 21, which provides that no person's property "shall be taken by law, without just compensation." In view of the provisions of the Indiana Constitution cited by the majority, "just compensation" for a site important to the free exercise of religion may require more than it otherwise would.

No case has addressed the issue under our state constitutional takings clause. In *United States v. 564.54 Acres of Land,* although the United States Supreme Court rejected the condemnee's claim in that case, the Court recognized that in very unusual circumstances fair market value may not constitute "just compensation" under the federal takings clause. 441 U.S. 506, 512–13, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) ("[W]hen market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards." (citations omitted)). Although that case involved a taking of property from a religious organization, there was no claim that the free exercise of religion was burdened. Rather, the claim was that the state should pay the cost of developing a "functionally equivalent" substitute facility rather than fair market value because the condemned property was exempt under grandfather provisions from regulations that would impose significant costs on a new facility. *Id.* at 508, 99 S.Ct. 1854. This claim was rejected on the basis that the condemnee would reap a windfall if it chose not to construct the new facility (in that case a campground for children), *id.* at 515–16, 99 S.Ct. 1854, and in any event a new facility would place the condemnee in a better position than before the taking of the older facility, *id.* at 517–18, 99 S.Ct. 1854 (White, J., concurring).

Similarly, in *State v. Lincoln Memory Gardens, Inc.,* 242 Ind. 206, 214, 177 N.E.2d 655, 659 (1961), this Court rejected the "principle of substitution" as a means of compensation in a case not implicating free exercise of religion. However, it is not entirely clear whether substitution means (1) replacement cost or (2) the amount necessary to put the condemnee in the same position as before the taking. The two are not necessarily the same because the latter may be accomplished by giving the condemnee a replica of the condemned asset, but may also be achieved by providing a different asset of equivalent value. In any event, "just compensation" is demanded by our constitution. In the overwhelming majority of cases, fair market value will constitute "just compensation" to the condemnee. Ordinarily, a claim of unique value to the owner will not overcome that presumption. But where a taking is shown to infringe upon a "core value," I would conclude that "just compensation" under the Indiana Constitution requires placing the owner in a substantially equivalent position as before the taking.

Here, the contention is that City Chapel needs more than fair market value to place it in the same position as before the taking—an operator of a facility positioned to serve the constituency required by its reli-

gious mission. If the trier of fact at the valuation stage agrees, this would provide a basis for compensation above the amount the property would command in the hands of a secular owner. But in my view, City Chapel has not presented a claim that, if established, would stop the City's condemnation in its tracks. Rather, even assuming the Chapel can establish what it claims, money, not a permanent barrier to downtown redevelopment, is the cure.

If the City is willing to accept the risk that City Chapel can establish that it requires more than the fair market value of the property to permit City Chapel to replace the condemned facility in a location and manner that are necessary to its religious mission, that is the City's decision. Fair market value is usually defined as the price upon which the hypothetical willing buyer and willing seller can agree. *Area Plan Comm'n v. Major,* 720 N.E.2d 391, 398 (Ind.Ct.App.1999). But if this formula is inadequate to avoid a material burden on the Chapel's exercise of religion, the City may have to pay more to achieve "just compensation" than it would if it were condemning a secular site. Given the Chapel's representation that this is a dispute over money, not religious principle, even if the Chapel proves all it claims, the solution is in dollars, not injunctive relief. In short, I do not believe that the Chapel's claim presents anything to be heard as to the taking, although it may be highly relevant to fixing the "just compensation" owed to the Chapel.

I agree with Justice Sullivan that the threshold issue is whether City Chapel is entitled to a hearing at the taking stage of this eminent domain proceeding. However, it seems to me that whether a hearing is required is determined by the issues raised by City Chapel. If its claims, if proven, would constitute a bar to the taking, it seems to me that City Chapel is entitled to a hearing in which it has the opportunity to prove them, just as any landowner may present the facts that support any legally recognized defense to the taking. See *Dohany v. Rogers,* 281 U.S. 362, 369, 50 S.Ct. 299, 74 L.Ed. 904 (1930) ("[The] requirements [of due process] are satisfied if he has reasonable notice and reasonable opportunity to be heard and to present his claim or defense [to the taking]."); *Derloshon v. City of Fort Wayne ex rel. Dep't of Redevelopment,* 250 Ind. 163, 171–72, 234 N.E.2d 269, 273–74 (1968) ("At some place in the [eminent domain] proceedings, and by some method the landowner is entitled to contest the legality of the condemnation proceedings, and question the authority under which the attempt is being made to take his property . . . .") (quoting *Cemetery Co. v. Warren Sch. Township,* 236 Ind. 171, 178, 139 N.E.2d 538, 541 (1957) (citations omitted)).[1] Because I do not believe City Chapel has presented a claim that bars the taking, I believe no hearing is required. But if such a claim had been raised, I would agree that City Chapel would be entitled to its day in court to present its proof.

Finally, I agree with Chief Justice Shepard that a "hybrid" claim requires at least something more than collective religious exercise to add a right of association to the religious exercise rights of the complainants. For the reasons given above, however, I disagree that under the state constitution a hearing is required on the taking as opposed to the compensation phase of the City's exercise of its right of eminent domain.

---

1. In *Dohany,* the landowner challenged the taking under a statute that he claimed provided for a process that fell below federal due process requirements. 281 U.S. at 366–67, 50 S.Ct. 299. In *Derloshon,* the landowner argued that he was denied due process when he was not given a hearing on his claim that the taking was for a private rather than a public purpose. This Court reversed and directed the trial court to hold a hearing. 250 Ind. at 165–66, 175, 234 N.E.2d at 270, 276.